E-FILED
Thursday, 15 October, 2020  11:31:48 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ALFRED CLAYBORNE, and<br>ANDREA ERLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 20-CV-3145-SEM-TSH |
| | ) | |
| MICHAEL BROWN, Individually and in his<br>official capacity as a detective for the<br>City of Springfield, Illinois, Police<br>Department and RYAN MADDOX,<br>Individually and in his official capacity<br>as a detective for the City of Springfield,<br>Illinois, Police Department; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE CITY OF SPRINGFIELD, ILLINOIS,<br>an Illinois municipal corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## **FIRST AMENDED COMPLAINT and JURY DEMAND**

NOW COMES, Plaintiffs, ALFRED CLAYBORNE, by and through

his attorney, Scott Sabin of  CHERRY, FRAZIER & SABIN, LLP, and

ANDREA ERLEY, by and through her attorney Fred Schlosser of

Gates, Wise Schlosser & Goebel, and for their Complaint against the

Defendants, MICHAEL BROWN, Individually and in his official

capacity as a law enforcement officer for the City of Springfield; RYAN MADDOX, Individually and in his official capacity as a law enforcement officer for the City of Springfield; and THE CITY OF SPRINGFIELD, ILLINOIS, an Illinois municipal corporation, state as follows.

## GENERAL ALLEGATIONS

1)    This is an action for money damages brought pursuant to 42 U.S.C. § 1983 and the common law and statues of the State of Illinois.

2)    Jurisdiction for Plaintiffs' federal claims is based on 28 U.S.C. §§ 1331 and 1343(a).  Jurisdiction for Plaintiffs' state law claims is based on supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

3)    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b), in that the claims arose within the Central District of Illinois, to wit; Springfield, Sangamon County, Illinois.

## Parties

4)    Plaintiff ALFRED CLAYBORNE (hereinafter "CLAYBORNE")

is a United States Citizen and a resident of Springfield, Sangamon County, Illinois.

5) Plaintiff, ANDREA ERLEY (hereinafter "ERLEY") is a United States Citizen and a resident of Springfield, Sangamon County, Illinois.

6) The Defendant, MICHAEL BROWN (hereinafter "BROWN"), is a duly appointed sworn law enforcement officer with the Springfield Police Department, employed by the Defendant, CITY OF SPRINGFIELD (hereinafter "CITY"), and at all relevant times to this Complaint, BROWN, was acting under the color of state law, ordinance and/or regulation and within the scope of his employment.

7) BROWN is sued in his individual capacity and his official capacity as a law enforcement officer for the City of Springfield.

8) The Defendant, RYAN MADDOX (hereinafter "MADDOX"), is a duly appointed sworn law enforcement officer with the Springfield Police Department, employed by the Defendant, CITY OF SPRINGFIELD (hereinafter "CITY"), and at all relevant times to this Complaint, MADDOX, was acting under the color of state law,

ordinance and/or regulation and within the scope of his employment.

9)    MADDOX is sued in his individual capacity and his official capacity as a law enforcement officer for the City of Springfield.

10)    The CITY is an Illinois municipal corporation with its principal place of business located in Sangamon County, Illinois, and is the employer of both BROWN and MADDOX.

11)    The CITY is directly liable for its unconstitutional customs and policies.  The CITY is vicariously liable for the common law and state law claims against BROWN and MADDOX pursuant to Respondeat Superior.

12)    The CITY is statutorily liable on an indemnification theory on all claims for all awards in this case related to BROWN and MADDOX, except for any punitive damages against either of them.

### Factual Allegations

13)    On May 24, 2019 the Springfield Police Department opened an investigation in reference to the theft of a wallet that had been reported stolen by an employee/complainant (hereinafter "complainant") of a local Springfield hospital.

14)   The complainant reported that her debit/credit card was being used to purchase various items around Springfield without her authority.

15)   A uniformed Springfield Police officer contacted the various business entities where the reported credit card transactions occurred and retrieved video footage of the transactions as well as still photos of a suspect.

16)  The reporting Springfield police officer produced a still photo of a black, male with a short goatee wearing a red shirt and jeans to the complainant and inquired if she recognized him as an employee or patient.

17)   The complainant said she did not recognize the male shown to her in the photograph, but noted that suspect in the photograph resembled the boyfriend of one of her employees, a CNA named Andrea J. Erley.

18)   The victim pulled up ERLEY'S Facebook page and showed the reporting officer a picture of ERLEY'S boyfriend whose name she did not know.  The reporting officer noted that ERLEY'S boyfriend

resembled the suspect, but he could not positively identify him from the photos.

19)  The complainant advised that she did not think ERLEY would have stolen her wallet and that ERLEY took a vacation day and was not even at work that day.

20)  During the course of the investigation, law enforcement subsequently learned that the name of the individual referenced as ERLEY'S boyfriend was ALFRED CLAYBORNE, a black male.

21)  On May 29, 2019, Detective MADDOX was assigned to further investigate the above described theft.

22)  MADDOX began his investigation by reviewing the original police report completed by the original responding field officer.

23)  Due to MADDOX attending state mandated training between the dates of May 29, 2019 and May 31, 2019, Detective BROWN assisted with this investigation due to MADDOX'S restricted availability.

24)  MADDOX and BROWN continued to focus their investigation on ERLEY and the person identified as her boyfriend,

CLAYBORNE.

25)   No other suspects were identified during the course of MADDOX and BROWNS investigation.

26)   After the theft, the complainant called her ex-husband, who still lived in their former marital home in Lincoln, Illinois, to inform him of the theft and to watch out for suspicious vehicles since the Lincoln address was printed on her driver's license that was in her purse when it was stolen.

27)   The complainant's ex-husband reported to her that earlier in the day while walking to his vehicle he saw an unidentified male drive by in gray Hundai Santa Fe and stared at him.

28)   On May 29, 2019, the complainant contacted the Springfield Police Department to report her conversation with her ex-husband and to report that she believed ERLEY drove a gray SUV which she thought was a Hyundai Santa Fe.

29)   During the course of the investigation, a LEADS inquiry showed that a 2014 Hyundai Utility vehicle gray in color was registered to ERLEY.

30)   On June 11, 2019, MADDOX reviewed and made arrangements to retrieve video footage from another one of the businesses where the suspect attempted to purchase merchandise with the complainant's credit card. None of the video showed what, if any, vehicle the suspect was driving.

31)   On June 12, 2019, MADDOX, reviewed and retrieved video footage from another one of the businesses where the suspect purchased merchandise with the complainant's credit card.  None of the video showed what, if any, vehicle the suspect was driving. MADDOX  canvassed surrounding businesses attempting to retreive additional video without success.

## CLAYBORNE is Unlawfully Seized On His Way to Work and Detained at the Police Station

32)   On June 14, 2019 at 08:00 a.m., BROWN and MADDOX drove in separate unmarked vehicles to stake out a residence at 3025 East Elm, where they suspected ERLEY and CLAYBORN lived.

33)   MADDOX and BROWN witnessed ERLEY leave the residence and MADDOX followed her to St. John's Hospital where ERLEY parked in her normal parking place on 7th street.  BROWN

stayed behind to watch and surveil CLAYBORNE.

34)   Sometime later, MADDOX returned to the Elm street address to join BROWN in monitoring CLAYBORNE.

35)   Sometime after 9:15 a.m. CLAYBORNE left the residence and drove his red Chevrolet Silverado toward Robert's Seafood, where he worked

36)   After traveling a short distance from his home, CLAYBORNE observed a sedan following him and being driven quite aggressively. CLAYBORNE thought it was an unmarked undercover police car.

37)   The driver of the unidentifed sedan pulled in front of him and essentially forced him to stop.

38)   At no time did CLAYBORNE commit a traffic infraction.  He had a valid driver's license, valid registration and proof of insurance for truck.

39)   By MADDOX'S own admission in the police report he generated, he and BROWN conducted what he called an "investigative stop."

40)   CLAYBORNE remained seated in his car.   MADDOX

approached him and ordered CLAYBORNE to produce his license and registration.

41)   CLAYBORNE asked MADDOX for permission to retrieve the requested items and then when granted permission reached into his wallet for his driver's license and then the car's console to retrieve his registration in order to comply with MADDOX'S demand.

42)   CLAYBORNE asked MADDOX, "What was going on?"

43)   MADDOX did not immediately respond other than to tell CLAYBORNE they will talk about it in a minute.

44)   MADDOX took CLAYBORNE'S documents, walked away, and then returned to CLAYBORNE's truck 30-45 seconds later.

45)   Upon returning to CLAYBORNE's truck, MADDOX ordered CLAYBORNE to get out of his truck, and CLAYBORNE complied.

46)   MADDOX instruced CLAYBORNE to walk back to the rear of his truck and stand next to BROWN, who was standing close to the tailgate.

47)   CLAYBORNE did as instructed and walked to the end of his truck.   CLAYBORNE then turned to MADDOX'S partner, BROWN,

and asked BROWN what was going on.

48)  CLAYBORNE was then informed by either BROWN or MADDOX that there was an investigation going on and his named popped up.

49)  CLAYBORNE then overheard one of the two officers radio dispatch  to check if there was a City car in the area, and several minutes later, a marked City of Springfield squad car arrived .

50)  CLAYBORNE was patted down, his keys, phone and identification were taken from him, and then he was placed in the back of the squad car and taken to the Springfield Police Department headquarters.

51)  MADDOX and BROWN escorted CLAYBORNE to an interrogation room.  CLAYBORNE still had no idea why he was being treated in this manner.

52)  MADDOX and BROWN then proceeded to pull out a blurry picture of a black, male with light skin tone and asked if that was him.

53)  When CLAYBORNE denied being the male in the photograph, MADDOX and BROWN accused him of lying.

54)   CLAYBORNE advised MADDOX and BROWN to cut the "bullshit" and further informed them he works two jobs and was on his way to work when they pulled him over and were now trying to force him to say the guy in the picture was him.

55)   At that time, CLAYBORNE was advised of his MIRANDA rights.

CLAYBORNE invoked his right to an attorney.

56)   At no time during the interview was CLAYBORNE advised as to whether the video and audio equipment was operating in the interrogation room,  but he believes it was not operating.

57)   CLAYBORNE advised MADDOX and BROWN that they had messed up at which point the detectives stormed out of the interview room and CLAYBORNE overheard them in the hallway state, "Let's go pick her up."   CLAYBORNE did not know who the officers were referencing to pick up.

58)   CLAYBORNE additionally overheard MADDOX or BROWN instruct an unknown officer to watch the room and to not let anyone approach CLAYBORNE while the detectives were gone.

59)   CLAYBORNE was left alone in the interrogation room for over an hour.

60)   CLAYBORNE yelled for nearly a minute until an unknown officer stuck his head in the room.  CLAYBORNE advised this officer he was picked up and taken to the police station on his way to work, and he demanded to know what he was being charged with.  The unknown officer said he would look into it.

**ERLEY is Unlawfully Seized at Work and Detained at the Police Station**

61)   After ERLEY had been working for several hours, she was summoned to the human resources department fo her employer.

62)   ERLEY, who had only been employed at the hospital since November, was afraid that she was being called to the human rights department to be terminated.

63)   ERLEY found her supervisor and asked why she was being

summoned to human resources, and her supervisor told her that "they" are waiting on you and advised her to keep her cool.

64) ERLEY was then instructed to go into the conference room, where she was met by two men.

65) ERLEY immediately began to cry. She did not know who the two men were, and she thought she was going to be fired for being late on several occasions.

66) The two men introduced themselves and detectives BROWN and MADDOX, who reassured ERLEY that no-one was hurt and that everyone was okay.

67) BROWN or MADDOX told ERLEY, "you need to come with us."

68) ERLEY responded, "Why? I haven't done anything."

69) The detectives told ERLEY that she needed to come down to the police station and talk to them.

70) ERLEY became more emotional and began to cry harder and did not understand whey the detectives wanted to speak to her,

and she denied having any information that would be beneficial to the police.

71)   ERLEY took off her stethoscope, badge, and labcoat, and retrieved her cell phone from her labcoat pocket, and one of the detectives grabbed her cell phone from her.

72)   As the detectives escorted ERLEY to their unmarked car parked in the parking garage, ERLEY kept asking them why they were taking her to the police station and what the investigation was about.

73)   One of the detectives responded that the investigation involved St. John's but he was corrected by the other detective, who said, "he's a dumbass; he means Prairie Heart."

74)   ERLEY then asked if this was about the theft of complainant's wallet and told the detectives that she was on vacation when it was stolen.

75)   The detectives drove ERLEY to the police station.  On the way, ERLEY was told that when they arrived at the police station to be quiet and put her hands behind her back and not to act like she was arrested.

76)   The detective placed ERLEY into a windowless interview view room and shut the door for what she believed was 45 minutes or so.

77)   Then, ERLEY was questioned about her boyfriend and what type of clothes her boyfriend wore to work at Robert's Seafood.

78)   ERLEY was shown a photograph she believed was taken from surveillance video at one of the involved stores, and denied that the suspect in the photograph was CLAYBORNE.

79)   At that time, a police officer opened the door to the interview room and the detectives said "come on in, this is his girl."

80)   ERLEY was informed that they didn't need to review any photographs because they had CLAYBORNE in the station, too.

81)   At this time, CLAYBORNE, who was in another interrogation room, hollered again and demanded to see a supervisor.

82)   ERLEY, who could hear CLAYBORNE, told the officers that he was getting angry, and that she needed a phone because CLAYBORNE needed to call work.

83)   BROWN   and   MADDOX   responde   to   ERLEY   that

CLAYBORNE "didn't have to be an asshole."  ERLEY was told that CLAYBORNE lawyered up, and that since CLAYBORNE "looked like him, we could have locked him up."

84)   An unknown supervisor appeared at the interrogation room about a half an hour after CLAYBORNE'S demand.   CLAYBORNE believes that the audio and video equipment may have been turned on at this time.  CLAYBORNE told the officer about being picked up and brought to the station and denied any involvement in or knowledge about whatever the detectives were investigating. The Supervisor than exited the room.

85)   ERLEY was asked, "do you want to see your man?"

**CLAYBORNE and ERLEY's Unlawful Detentions Continue as BROWN and MADDOX Leave the Police Station to Continue Their Investigation**

86)   BROWN and MADDOX then escorted CLAYBORNE into the interrogation room where ERLEY was and then left.

87)   Neither ERLEY nor CLAYBORNE were told what they were being held for, how long they were going to be held, or where BROWN and MADDOX were going.

88)  Neither ERLEY nor CLAYBORNE were free to leave as the Detectives instructed them to wait there in the room.

89)  MADDOX and BROWN departed the station and went to Robert's Seafood where they intended to check CLAYBORNE'S time card to see if he was at work at the time of the theft and unlawful use of the complainant's credit card occurred.

90)  MADDOX and BROWN met with CLAYBORNE'S on-duty manager, who provided them with CLAYBORNE'S time cards that confirmed he was at work during the time of the thefts.

91)  The manager was shown a photo of the suspect leaving a store.  The manager denied it was CLAYBORNE.

92)  CLAYBORNE'S time card also showed he was checked in at work at not only the time of the alleged theft and credit card transactions but also the time the victim's ex-husband observed a suspicious person driving by his home.

93)  Sometime around noon, approximately four hours after CLAYBORNE was stopped and brought to the station and approximately 1 ½ hours after ERLEY was removed and whisked from

her place of employment and brought to the station, both CLAYBORNE and ERLEY were released.

94)   BROWN returned CLAYBORNE to his vehicle and MADDOX drove  ERLEY back to work.

95)   It was only while CLAYBORNE was being driven back to his truck by BROWN that he returned to CLAYBORNE'S identification, phone and keys to him.

96)   While returning CLAYBORNE to his vehicle, BROWN turned into a Bank of Springfield parking lot and used the Automated Teller Machine.

97)   BROWN remarked, "We really screwed up and said we want to reimburse you."

98)   CLAYBORNE witnessed BROWN pull out a debit card and withdraw an unknown amount off U.S. currency and then BROWN proceeded to hand CLAYBORNE $40.00 unsolicited dollars and remarked a second time "we messed up" and something to the effect, "let's not worry about it."

99)   Subsequent to CLAYBORNE and ERLEY'S unlawful

seizures, detentions and questioning, both Plaintiffs consulted and retained their respective attorneys.

100) The Plaintiffs were never charged with any wrongdoing.

101) Defendants BROWN and MADDOX acted willfully and wantonly, maliciously and with a conscious disregard and deliberate indifference to Plaintiffs' rights.

102) As a direct and proximate result of the acts of the Defendants BROWN and MADDOX described above, Plaintiffs suffered damages, including loss of physical liberty and emotional distress.

## COUNT I

### (42 U.S.C. §1983 – CLAYBORNE - Unreasonable Seizure)

1 - 102)   CLAYBORNE  realleges paragraphs 1-102 as if fully set forth herein in Count I.

103) After surveilling Plaintiffs and observing CLAYBORNE depart from his home, BROWN and MADDOX conducted a traffic stop of  CLAYBORNE'S truck.

104) Neither BROWN nor MADDOX witnessed CLAYBORNE commit any traffic infraction and consequently did not have a

reasonable suspicion, based upon specific articulable facts that CLAYBORNE, had committed or was otherwise involved in criminal activity at the time.

105) Neither BROWN nor MADDOX had any other legal justification to seize CLAYBORNE.

106) The seizure of CLAYBORNE without reasonable suspicion or any other legal justification violated his Fourth Amendment rights, as guaranteed by the Fourteenth Amendment, to be free from unreasonable seizures.

WHEREFORE, Plaintiff ALFRED CLAYBORNE, asks that this Honorable Court:

A.     Enter judgment in favor of CLAYBORNE and against BROWN and MADDOX for compensatory and punitive damages,

B.     Award CLAYBORNE his attorneys' fees and costs, and

C.     Award any further relief this Honorable Court deems just and equitable.

## COUNT II

### (42 U.S.C. §1983 – CLAYBORNE - False Arrest)

1 - 102)   CLAYBORNE  realleges paragraphs 1-102 as if fully set forth herein in Count II.

103) While checking CLAYBORNE'S license and registration, BROWN and MADDOX did not allow CLAYBORNE to leave.

104) Neither BROWN nor MADDOX had an arrest warrant, probable cause or any other justification to stop CLAYBORNE'S truck.

105) Subsequent to this improper and illegal stop, MADDOX and BROWN, insisted CLAYBORNE accompany them to the Springfield Police Department.

106) MADDOX called for a squad car to transport CLAYBORNE to the station.

107) At the station BROWN and MADDOX interviewed CLAYBORNE in an interrogation room.

108) BROWN and MADDOX left CLAYBORNE alone in the interrogation room and  left the station to locate, confront and bring in for questioning ERLEY from her place of employment.

109) Not only did BROWN and MADDOX leave CLAYBORNE alone in the interrogation room and leave the station to confront ERLEY but they also unlawfully detained him when they went to CLAYBORNE'S place of employment, Robert's Seafood, to question management about CLAYBORNE.

110) CLAYBORNE was under arrest and not free to leave the station while MADDOX and BROWN continued their investigation.

111) BROWN and MADDOX did not have an arrest warrant, probable cause, or any other legal justification to arrest Plaintiff

112) CLAYBORNE'S arrest without any legal justification or probable cause violated his Fourth Amendment right, as guaranteed by the Fourteenth Amendment to be free from unreasonable seizures.

WHEREFORE, Plaintiff ALFRED CLAYBORNE, asks that this Honorable Court:

A.    Enter judgment in favor of CLAYBORNE and against BROWN and MADDOX for compensatory and punitive damages,

B.    Award CLAYBORNE his attorneys' fees and costs, and

C.    Award any further relief this Honorable Court deems

just and equitable.

## COUNT III

## (State Law – CLAYBORNE – False Arrest Against Maddox, Brown & City)

1 - 102)    CLAYBORNE  realleges paragraphs 1-102 as if fully set forth herein in Count III.

103) CLAYBORNE was detained and arrested by BROWN and MADDOX despite their knowledge that there was no lawful justification for doing so.

104) BROWN and MADDOX'S  misconduct was objectively unreasonable and was undertaken intentionally, with malice and reckless indifference to CLAYBORNE'S rights.

105) As a result of the above-described wrongful infringement of his rights, CLAYBORNE, was injured, physically, emotionally and financially.

106) The CITY is liable for BROWN and MADDOX'S actions pursuant to the doctrine of respondeat superior, as BROWN and

MADDOX'S acts occurred with the scope of their employment with the CITY.

WHEREFORE, Plaintiff ALFRED CLAYBORNE, asks that this Honorable Court:

A.     Enter judgment in favor of CLAYBORNE and against BROWN and MADDOX for compensatory and punitive damages,

B.     Enter judgment in favor of the CLAYBORNE and against the CITY for compensatory damages,

C.     Award any further relief this Honorable Court deems just and equitable.

**COUNT IV**

**(State Law – CLAYBORNE – Intentional Infliction of Emotional Distress Against Maddox, Brown & City)**

1 - 102)    CLAYBORNE  realleges paragraphs 1-102 as if fully set forth herein Count IV.

103) In the manner more fully described above, by unlawfully stopping and arresting CLAYBORNE and then detaining him while BROWN and MADDOX continued their investigation, engaged in

extreme and outrageous conduct.    104) BROWN and MADDOX'S actions set forth above were rooted in an abuse of power or authority.

105) BROWN and MADDOX'S actions set forth above were undertaken with intent or knowledge that there was a high probability that their conduct would inflict severe emotional distress with reckless disregard of that probability.

106) BROWN and MADDOX'S actions set forth above were undertaken with malice, willfulness and reckless indifference to CLAYBORNE'S rights.

107) The CITY is liable for BROWN and MADDOX'S actions pursuant to the doctrine of respondeat superior, as BROWN and MADDOX'S acts occurred with the scope of their employment with the CITY.

WHEREFORE, Plaintiff ALFRED CLAYBORNE, asks that this Honorable Court:

A.    Enter judgment in favor of CLAYBORNE and against BROWN and MADDOX for compensatory and punitive damages,

B.    Enter judgment in favor of the CLAYBORNE and

against the CITY for compensatory damages,

   C. Award any further relief this Honorable Court deems just and equitable.

## COUNT V

## (State Law – CLAYBORNE – Statutory Indemnification Against City)

1 - 102) CLAYBORNE  realleges paragraphs 1-102 as if fully set forth herein in Count V.

103) Illinois Law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable with the scope of their employment activities.

104) BROWN and MADDOX were at all relevant times employees of the City, and were acting within the scope of their employment in committing the misconduct described above.

105) The City is therefore obligated to pay any judgment for compensatory damages entered against BROWN and/or MADDOX

WHEREFORE, Plaintiff ALFRED CLAYBORNE, asks that this Honorable Court:

A.     Enter judgment in favor of CLAYBORNE and against CITY for any compensatory damages awarded against BROWN and/or MADDOX;

B.     Award any further relief this Honorable Court deems just and equitable.

## COUNT VI

### (42 U.S.C. §1983 – ERLEY - Unreasonable Seizure)

1 - 102)     ERLEY realleges paragraphs 1-102 as if fully set forth herein in Count VI.

103) On June 14, 2019, BROWN and MADDOX appeared at ERLEY'S place of employment and demanded that she accompany them to the police station.

104) BROWN and MADDOX took ERLEY to the police station where they questioned her in reference to their on-going fraud investigation.

105) Neither BROWN nor MADDOX had any legal justification to

detain and require ERLEY to accompany them.

106) The seizure of ERLEY without reasonable suspicion or any other legal justification violated her Fourth Amendment rights, as guaranteed by the Fourteenth Amendment, to be free from unreasonable seizures.

WHEREFORE, Plaintiff ANDREA ERLEY, asks that this Honorable Court:

    A.    Enter judgment in favor of ERLEY and against BROWN and MADDOX for compensatory and punitive damages,

    B.    Award ERLEY her attorneys' fees and costs, and

    C.    Award any further relief this Honorable Court deems just and equitable.

## COUNT VII

### (42 U.S.C. §1983 – ERLEY - False Arrest)

1 - 102)    ERLEY realleges paragraphs 1-102 as if fully set forth herein in Count VII.

103) On June 14, 2019, BROWN and MADDOX appeared at ERLEY'S place of employment and demanded that she accompany

them to the police station.

104) BROWN and MADDOX took ERLEY to the police station where they detained and questioned her in reference to their on-going fraud investigation for an hour or more.

105) After approximately one hour, BROWN and MADDOX left ERLEY alone in the interrogation room.  She was under arrest and not free to leave.

106) BROWN and MADDOX then left both ERLEY and CLAYBORNE at the police station while they left the premises to make inquiry at CLAYBORNE's place of employment, Robert's Seafood.

107) ERLEY was directed to wait in the interrogation room with CLAYBORNE.  She was under arrest and not free to leave.

WHEREFORE, Plaintiff ANDREA ERLEY, asks that this Honorable Court:

A.     Enter judgment in favor of ERLEY and against BROWN and MADDOX for compensatory and punitive damages,

B.     Award ERLEY her attorneys' fees and costs, and

C.     Award any further relief this Honorable Court deems

just and equitable.

## COUNT VIII

## (State Law – ERLEY – False Arrest Against Maddox, Brown & City)

1 - 102)    ERLEY realleges paragraphs 1-102 as if fully set forth herein in Count VIII.

103) On June 14, 2019, BROWN and MADDOX appeared at ERLEY'S place of employment and demanded that she accompany them to the police station.

104) ERLEY was detained and arrested by BROWN and MADDOX despite their knowledge that there was no lawful justification for doing so.

105) BROWN and MADDOX'S  misconduct was objectively unreasonable and was undertaken intentionally, with malice and reckless indifference to ERLEY'S rights.

106) As a result of the above-described wrongful infringement of her rights, ERLEY, was injured, physically, emotionally and financially.

107) The CITY is liable for BROWN and MADDOX'S actions pursuant to the doctrine of respondeat superior, as BROWN and MADDOX'S acts occurred with the scope of their employment with the CITY.

WHEREFORE, Plaintiff ANDREA ERLEY, asks that this Honorable Court:

A.     Enter judgment in favor of ERLEY and against BROWN and MADDOX for compensatory and punitive damages,

B.     Enter judgment in favor of the ERLEY and against the CITY for compensatory damages,

C.     Award any further relief this Honorable Court deems just and equitable.

## COUNT IX

## (State Law – ERLEY – Intentional Infliction of Emotional Distress Against Maddox, Brown & City)

1 - 102)     ERLEY realleges paragraphs 1-102 as if fully set forth herein in Count IX.

103) In the manner more fully described above, BROWN and

MADDOX engaged in extreme and outrageous conduct by unlawfully detaining and arresting ERLEY and requiring her to remain situated in the stationhouse interrogation room, while they left the premises to conduct further investigations.

104) BROWN and MADDOX'S actions set forth above were rooted in an abuse of power or authority.

105) BROWN and MADDOX'S actions set forth above were undertaken with intent or knowledge that there was a high probability that their conduct would inflict severe emotional distress with reckless disregard of that probability.

106) BROWN and MADDOX'S actions set forth above were undertaken with malice, willfulness and reckless indifference to ERLEY'S rights.

107) The CITY is liable for BROWN and MADDOX'S actions pursuant to the doctrine of respondeat superior, as BROWN and MADDOX'S acts occurred with the scope of their employment with the CITY.

WHEREFORE, Plaintiff ANDREA ERLEY, asks that this

Honorable Court:

A.      Enter judgment in favor of ERLEY and against BROWN and MADDOX for compensatory and punitive damages,

B.      Enter judgment in favor of the ERLEY and against the CITY for compensatory damages,

C.      Award any further relief this Honorable Court deems just and equitable.

## COUNT X

## (State Law – ERLEY – Statutory Indemnification Against the City)

1 - 102)    ERLEY realleges paragraphs 1-102 as if fully set forth herein Count I.

103)  Illinois Law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable with the scope of their employment activities.

104)  BROWN and MADDOX were at all relevant times employees of the City, and were acting within the scope of their employment in committing the misconduct described above.

105) The City is therefore obligated to pay any judgment for compensatory damages entered against BROWN and/or MADDOX

WHEREFORE, Plaintiff ANDREA ERLEY, asks that this Honorable Court:

A.    Enter judgment in favor of ERLEY and against  CITY for any compensatory damages awarded against BROWN and/or MADDOX;

B.    Award any further relief this Honorable Court deems just and equitable.

Respectfully Submitted,
ALFRED CLAYBORNE, Plaintiff,

By:   /s/ Scott A. Sabin
                One of his Attorneys


Scott Sabin (6209921)
Attorney for Plaintiff Alfred Clayborne
Cherry, Frazier & Sabin, LLP
1 West Old State Capital
Myers Building, Suite 800
Springfield, IL  62701
(217)753-4242
sabin@springfieldlawfirm.com

Respectfully Submitted,
ANDREA ERLEY, Plaintiff,


By:   /s/ Frederick J. Schlosser
                    One of her Attorneys

Frederick J. Schlosser (6209954)
Attorney for Plaintiff Andrea Erley
Gates, Wise, Schlosser & Goebel
1231 South Eighth Street
Springfield, IL 62703
(217)522-9010
fred@gwspc.com