## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| **ALFRED CLAYBORNE and ANDREA ERLEY,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 20-cv-3145** |
| ) | |
| **MICHAEL BROWN, RYAN MADDOX, and CITY OF SPRINGFIELD,** ) | |
| ) | |
| **Defendants.** ) | |

## OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE:**

Before the Court is Defendants Michael Brown, Ryan Maddox, and the City of Springfield ("Defendants") Motion for Summary Judgment (d/e 40).  For the reasons set forth below, the motion is DENIED.

## I.    INTRODUCTION

On June 12, 2020, Plaintiffs Alfred Clayborne and Andrea Erley ("Plaintiffs") filed a ten-Count Complaint against Defendants (d/e 1).  On October 14, 2020, Plaintiffs filed an Amended ten-Count Complaint against Defendants (d/e 22).  Counts I and II,

brought under 42 U.S.C. § 1983, allege that Defendants Brown and Maddox unreasonably seized and falsely arrested Plaintiff Clayborne, respectively.  Count III is a state law claim in which Plaintiff Clayborne alleges false arrest against both individual Defendants and the City of Springfield (the "City").  Count IV is a state law claim in which Plaintiff Clayborne alleges intentional infliction of emotional distress against both individual Defendants and the City of Springfield (the "City").  Count V is a state law claim in which Plaintiff Clayborne alleges an indemnification action against the City.  Counts VI and VII, brought under § 1983, allege that Defendants Brown and Maddox unreasonably seized and falsely arrested Plaintiff Erley, respectively.  Count VIII is a state law claim in which Plaintiff Erley alleges false arrest against both individual Defendants and the City.  Count IX is a state law claim in which Plaintiff Erley alleges intentional infliction of emotional distress against both individual Defendants and the City.  Count X is a state law claim in which Plaintiff Erley alleges an indemnification action against the City.

On August 12, 2022, Defendants filed their Motion for Summary Judgment (d/e 40).  On September 23, 2022, Plaintiffs

filed their responses (d/e 44, 45).  On October 14, 2022,

Defendants filed their Reply (d/e 46).

## II.  JURISDICTION AND VENUE

The Court has subject matter jurisdiction over Plaintiffs' §

1983 claims because they arise under the United States

Constitution and are brought pursuant to a federal statute.  <u>See</u> 28

U.S.C. § 1331 ("The district courts shall have original jurisdiction of

all civil actions arising under the Constitution, laws, or treaties of

the United States.").  Because Plaintiffs' state law claims against the

City are related to Plaintiffs' § 1983 claims such that the claims

form part of the same case or controversy, the Court has

supplemental jurisdiction over the state law claims.  <u>See</u> 28 U.S.C §

1367(a).

The events giving rise to Plaintiff's claims occurred in

Sangamon County, Illinois, which is located within the boundaries

of the Central District of Illinois.  Venue is therefore proper in this

district.  <u>See</u> 28 U.S.C. § 1391(b)(2) (stating that a civil action may

be brought in "a judicial district in which a substantial part of the

events or omissions giving rise to the claim occurred").

## III.  FACTS

The Court draws the following facts from the parties' Local
Rule 7.1(D)(1)(b) statements of undisputed material facts.  The
Court discusses any material factual disputes in its analysis.
Immaterial facts or factual disputes are omitted.  Any fact
submitted by any party that was not supported by a citation to
evidence will not be considered by the Court.  See Civil LR
7.1(D)(2)(b)(2).  In addition, if any response to a fact failed to
support each allegedly disputed fact with evidentiary
documentation, that fact is deemed admitted.  Id.

The City of Springfield employed Detectives Michael Brown
and Ryan Maddox, and the detectives were performing their official
duties at all relevant times.  On May 24, 2019, Springfield Police
Department Officer Jennifer Wallace was dispatched to Prairie
Heart Institute (the "Institute") to investigate the theft of employee
Gayle Hoock's wallet.  Officer Wallace investigated the wallet theft
and made a record of her findings.  On May 29, 2019, Detective
Maddox was assigned to the investigation and began working the
case on June 4, 2019.  At the time, Detective Maddox was recently
made a detective and Detective Brown was Detective Maddox's
assigned field training detective.  Both Detectives Maddox and

Brown began their investigation of the wallet theft by reviewing Officer Wallace's report.

From Officer Wallace's report, Detective Maddox learned that Hoock's credit card, contained in the stolen wallet, had been used at Target. The person who used the card was captured on Target security video. Detective Maddox also learned from the report that the suspect in the video was a Black male with a short goatee, and that Hoock informed Officer Wallace that the suspect from the Target security video "resembled the boyfriend of one of her employee's." The employee in question was Plaintiff Andrea Erley, and the boyfriend in question was Plaintiff Alfred Clayborne.

Hoock informed Officer Wallace that Erley had taken a vacation day on the day of the wallet theft. Hoock also showed Officer Wallace a picture of Clayborne from Erley's Facebook page. Officer Wallace wrote in her report, "[I]t did resemble the suspect, but I could not positively identify him from these photo's." d/e 40, Ex. E, p. 4.

On June 4, 2019, Detective Maddox personally compared the surveillance video of the suspect from Target with the social media photographs of Clayborne and observed similar characteristics

between the two subjects.  Detective Maddox spoke with Hoock, who provided the same information relating to the incident as was contained in Officer Wallace's report. Hoock also told Detective Maddox where Erley lived and that she lived with a Black man.

On June 14, 2019, Detectives Maddox and Brown travelled in separate, unmarked police vehicles to Erley's residence.  When Erley left for work that morning, Detective Maddox followed and observed her in her vehicle, a silver Hyundai Sante Fe, while Detective Brown remained observing Erley's residence.  Detective Maddox then returned to Erley's residence.

At around 9:50 a.m., Clayborne left the residence.  Detectives Brown and Maddox conducted what Detective Maddox described in the report as "an investigatory stop" at the intersection of Wesley and Clearlake Streets.  At the stop, Detective Maddox observed Clayborne had "similar physical and facial characteristics of the suspect" from the surveillance video.   d/e 40, Ex. E, p. 12.  Prior to stopping Clayborne's vehicle, Detective Brown had not observed any traffic infractions committed by Clayborne.  At the time the detectives stopped Clayborne, both detectives testified that they had not established probable cause for an arrest.

Upon being stopped, Clayborne told the detectives that he was on his way to work at Robert's Seafood.  The detectives informed Clayborne that they wished to speak with him about an ongoing investigation.  While Detective Maddox asked Clayborne to accompany them back to the station, Detective Brown called for a marked car transport for Clayborne.  Detective Brown explained that they needed a squad car to transport Clayborne because Clayborne was a potential suspect, and department rules require suspects or potential suspects to be transported in vehicles equipped with transport cages in the back.

During the transport, Clayborne was not handcuffed. Clayborne was never told he was under arrest.  Upon arrival at the station, Clayborne was escorted into an unlocked interview room. The detectives advised Clayborne of his <u>Miranda</u> rights.  Clayborne invoked his right to have an attorney present, and the detectives ceased questioning Clayborne.  The detectives left Clayborne in the interview room and told him that there were other detectives outside if he needed anything.

The detectives then went to the Institute to bring Erley to the station.  The detectives wished to question Erley at the station in

part to ensure that she was separate from and not in communication with Clayborne.  The detectives did not tell Erley she was under arrest, did not read her <u>Miranda</u> rights, did not handcuff her, and she was allowed to ride in the front seat of the officer's vehicle.

At the station, Erley was escorted to an interview room. Detective Brown showed Erley a picture of the suspect exiting Target.  Erley denied that it was Clayborne in the picture.  The detectives left Clayborne and Erley in their respective interview rooms while they travelled to Robert's Seafood to determine whether Clayborne had been working on the day and time of the wallet theft and use of the credit cards.

At Robert's Seafood, the detectives spoke to the on-duty manager who showed the detectives Clayborne's time card for the day in question which indicated that he had been at work at the time of the wallet theft.  They also showed the manager the photograph of the suspect from the Target video, and he denied it was Clayborne.

The detectives returned to the station and informed Clayborne that he was no longer a suspect.  Detective Maddox drove Erley

back to her workplace, and Detective Brown drove Clayborne back to his vehicle.  The total time from when Clayborne was picked up until he was returned to his truck was estimated to be two hours.

Prior to being told he was no longer a potential suspect, Clayborne did not ask anyone whether he could leave.  Similarly, Erley never asked whether she could leave while she was with the detectives or in the interview room.

## IV.   LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Carroll v. Lynch</u>, 698 F.3d 561, 564 (7th Cir. 2012).  When ruling on a motion for summary judgment, the Court must construe facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.  <u>Woodruff v. Mason</u>, 542 F.3d 545, 550 (7th Cir. 2008).  "At summary judgment, 'a court may not make credibility determinations, weigh the evidence, or decide which

inferences to draw from the facts; these are jobs for a factfinder.'"
Paz v. Wauconda Healthcare & Rehab. Ctr., LLC, 464 F.3d 659, 664
(7th Cir. 2006).

The movant bears the initial responsibility of informing the
Court of the basis for the motion and identifying the evidence the
movant believes demonstrates the absence of any genuine dispute
of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);
Modrowski v. Pigatto, 712 F.3d 1166, 1168 (7th Cir. 2013)
(explaining that Rule 56 "imposes an initial burden of production on
the party moving for summary judgment to inform the district court
why a trial is not necessary" (internal citation omitted)).  After the
moving party does so, the non-moving party must then go beyond
the pleadings and "set forth specific facts showing that there is a
genuine issue for trial."  Anderson, 477 U.S. at 255 (quotation and
footnotes omitted).

## IV.  ANALYSIS

As a preliminary matter, Plaintiffs Clayborne and Erley both
assert claims that the detectives violated their constitutional rights
under 42 U.S.C. § 1983 to be free from unreasonable seizure and
false arrest (Counts I, II, VI, and VII).  To establish a claim under

Section 1983, a plaintiff must show that the defendant: (1) acted under the color of state law; and (2) deprived the plaintiff of a constitutionally protected right.  Savory v. Lyons, 469 F.3d 667, 670 (7th Cir. 2006).  The City of Springfield employed the Defendant detectives, and the detectives were performing their official duties at all relevant times.  d/e 40, p. 3.  Therefore, Plaintiffs have shown that Detectives Brown and Maddox were acting under color of state law.  The remaining issue before the Court on Plaintiffs' § 1983 claims is whether a reasonable jury could find that the detectives deprived Plaintiffs of their Fourth and Fourteenth Amendment rights.

### A. Defendants Are Not Entitled to Summary Judgment on Plaintiff Clayborne's § 1983 Unreasonable Seizure Claim (Count I).

Plaintiff Clayborne claims that the detectives violated his constitutional right under 42 U.S.C. § 1983 to be free from unreasonable seizure.  Defendants move for summary judgment on the ground that they had reasonable suspicion, and even objective probable cause, to detain Clayborne.  Furthermore, they argue that they are entitled to qualified immunity as to Clayborne's § 1983 claims.  In response, Clayborne alleges that there are genuine

issues of material fact regarding whether the detectives had

"'reasonable articulable suspicion' and/or 'probable cause'" to

detain him.  d/e 45, p. 21–22.  Since Clayborne argues two

separate standards, the Court examines his unreasonable seizure

and false arrest claims separately.

### 1. There is a Genuine Issue of Material Fact Whether the Detectives Had Reasonable Suspicion to Conduct a <u>Terry</u> Stop.

Clayborne first alleges that the detectives' seizure of him at the

traffic stop violated the Fourth Amendment's prohibition of

unreasonable seizures because the detectives did not have

reasonable suspicion or any other legal justification to detain him.

The Fourth Amendment prohibits "unreasonable searches and

seizures."  U.S. Const. amend. IV.  A Fourth Amendment inquiry

requires the Court to determine (1) whether a seizure actually

occurred, and if so, (2) whether the seizure was unreasonable.  <u>See</u>

<u>Florida v. Jimeno</u>, 500 U.S. 248, 240 (1991); <u>Carlson v. Bukovic</u>,

621 F.3d 610, 618 (7th Cir. 2010).

First, the Court examines whether a seizure actually occurred.

<u>See</u> <u>Jimeno</u>, 500 U.S. at 240.  A "seizure" within the meaning of the

Fourth Amendment occurs when a person's "freedom of movement

is restrained" either "by means of physical force or show of authority." United States v. Mendenhall, 466 U.S. 544, 552 (1980). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Drayton, 536 U.S. 194, 201 (2002). This standard is objective and "is made on the basis of the 'totality of the circumstances' surrounding the encounter." United States v. Jerez, 108 F.3d 684, 690 (7th Cir. 1997) (quoting Florida v. Bostick, 501 U.S. 429, 439 (1991)). In considering the totality of the circumstances, factors include

> (1) whether the encounter occurred in a public place; (2) whether the suspect consented to speak with the officers; (3) whether the officers informed the individual that he was not under arrest and was free to leave; (4) whether the individuals were moved to another area; (5) whether there was a threatening presence of several officers and a display of weapons or physical force; (6) whether the officers deprived the defendant of documents she needed to continue on her way; and (7) whether the officers' tone of voice was such that their requests would likely be obeyed.

United States v. Barker, 467 F.3d 625, 629 (7th Cir. 2006) (citation omitted).

Here, the Court finds that that a reasonable jury may find that Clayborne's detention was a seizure. After the detectives conducted a traffic stop on Clayborne, he was transported to the police station

in a squad car.  See id.  Additionally, Clayborne has presented

sufficient evidence to raise a genuine issue of material fact as to

whether his detention was a seizure.  Clayborne, in his affidavit,

asserts that he was deprived of his wallet, phone, and keys.  See id.;

d/e 45, Ex. N, ¶ 2, 3.  Moreover, Defendants concede that "for the

purposes of this motion . . . Clayborne was not free to leave."  d/e

40, p. 12; see Drayton, 536 U.S. at 201; Bostick, 501 U.S. at 439.

Second, the Court examines whether the seizure was

unreasonable.  Whether the detectives' seizure of Clayborne was

unreasonable hinges on whether the seizure was an arrest, or a

Terry stop.  Arrests must be supported by probable cause, while

lesser seizures only need to be supported by reasonable suspicion.

See United States v. Lopez, 907 F.3d 472, 478 (7th Cir. 2018).

Defendants admit that they did not have probable cause to arrest

Clayborne at the time they stopped him; rather, Defendants argue

that Clayborne was "detained under a reasonable suspicion" that he

was the suspect in the Target surveillance video, citing Terry v.

Ohio, 392 U.S. 1, 88 (1968).  See d/e 40, p. 7, ¶40.  In doing so,

Defendants characterize their detention of Clayborne as a Terry

stop.

Law enforcement officers may conduct a brief, investigatory stop of an individual—also known as a <u>Terry</u> stop—if the officer has reasonable, articulable suspicion that the individual has committed or is about to commit a crime.  <u>See</u> <u>Terry</u>, 392 U.S. at 20–22; <u>United States v. Booker</u>, 579 F.3d 835, 838 (7th Cir. 2009).  Reasonable suspicion is a "less demanding standard" than probable cause.  <u>Lopez</u>, 907 F.3d at 479.  However, the officer initiating the investigatory stop must be able to point to "specific and articulable facts" that suggest criminality, rather than basing his actions on a mere hunch.  <u>Terry</u>, 392 U.S. at 21–22.  Reasonable suspicion is an objective inquiry based upon the totality of the circumstances known to the officer at the time the stop is made.  <u>United States v. Hicks</u>, 531 F.3d 555, 558 (7th Cir. 2008).

Defendants argue that they had reasonable suspicion to detain Clayborne because (1) when shown a picture of the suspect, Hoock stated it looked like Clayborne; (2) Officer Wallace's report stated that the photo looked like the photograph of Clayborne on Erley's Facebook page; (3) the detectives saw similarities when comparing photographs and when they observed Clayborne in person on the morning of Clayborne's detention; and (4) Hoock's ex-husband

observed a suspicious drive-by of his rural residence by a Black

male in a vehicle matching Erley's vehicle.

As a preliminary matter, Plaintiffs categorize the facts

surrounding Hoock's ex-husband's observation of a Black male

driving by his residence as undisputed but immaterial.  Specifically,

Plaintiffs argue that Detective Maddox learned from Officer

Wallace's report that Hoock had called the police station to report

that her driver's license, located in her stolen wallet, still contained

her former address, where her ex-husband still resides.  Hoock

called her ex-husband and told him to "watch out for suspicious

vehicles."  d/e 40, Ex. E, p. 6.  Her ex-husband informed her that

earlier that day, he observed a Black male drive by in a grey

Hyundai Sante Fe SUV "staring at him."  Id.  Hoock also informed

the station that she believed Erley had a grey Hyundai SUV

registered to her.

Plaintiffs argue that these facts are immaterial because the

detectives testified to not relying on this information in detaining

Clayborne or Erley.  However, the reasonable suspicion standard is

an objective one; the officer's subjective motivations for stopping

and detaining a suspect are irrelevant to the reasonableness

inquiry.  See <u>Bullock</u>, 632 F.3d at 1012 (the reasonableness of the stop is based on an objective standard).  As a result, whether the detectives had reasonable suspicion is an objective inquiry based on the totality of the circumstances known to the officer at the time of the encounter.  <u>Hicks</u>, 531 F.3d at 558.  Here, the aforementioned facts were known to the detectives at the time of Clayborne and Erley's alleged seizures.  Moreover, asserting that a fact is immaterial does not dispute it, so the Court considers the aforementioned facts.

The Court finds that there is a genuine dispute of material fact whether the detectives had reasonable suspicion to conduct a traffic stop on Clayborne.  Here, it is undisputed that prior to stopping Clayborne's vehicle, Detective Brown had not observed any traffic violations committed by Clayborne.  The seizure of Clayborne took place nearly three weeks after the wallet theft occurred, when no ongoing emergency existed.  The detectives' basis for stopping Clayborne largely stems from the similarities between Clayborne and the suspect in the Target video, as alleged by Hoock, Officer Wallace, and the detectives themselves.  Specifically, Hoock stated that the suspect in the Target security video resembled Clayborne.

Officer Wallace, who authored the report relied upon by the
Defendant detectives, noted that a Facebook picture of Clayborne
"resemble[d] the suspect" although she "could not positively identify
him from these photo's."  d/e 40, Ex. E, p. 4.  Detective Maddox
then personally compared the suspect in the security video from
Target with the Facebook photograph of Clayborne and observed
similarities between the two subjects.  At the traffic stop, Detective
Maddox also observed Clayborne had "similar physical and facial
characteristics of the suspect" from the Target security video.  d/e
40, Ex. E, p. 12.

     In United States v. Scheets, the Seventh Circuit found that an
agent's Terry stop of Defendant Scheets was supported by
reasonable suspicion that Scheets had robbed a bank earlier that
day.  188 F.3d 829, 837–38 (7th Cir. 1999).  There, the agent
testified that he compared Scheets to the photograph of the bank
robbery suspect and noticed several similarities, "which taken
together would not likely have been ascribed to the population at
large."  Id. at 838.  The similarities included Scheets's "use of a
cane, his glasses, and the cupped appearance of one of his hands."
Id.  When considering that evidence, as well as the agent's years of

law enforcement experience, a physical description of the suspect from the police department, and their confirmation that the suspect had a limp and used a cane, the court found that reasonable suspicion existed to detain Scheets for investigatory purposes.  Id.; see also United States v. Springs, 17 F.3d 192, 194 (7th Cir. 1994) (detective had reasonable suspicion that defendant was involved in robbery because of anonymous tips, photographic record that the car may have been in the parking lot at the time of the robbery, and the detectives' recognition of defendant's face from surveillance photographs).

In contrast to the detectives' identification in Scheets, here, the detectives allege unspecified similarities between Clayborne and the suspect in the Target video—"similar physical and facial characteristics of the suspect"—and make no mention of the individuals' gait, specific facial features, clothing, or other distinctive features.  While both Clayborne and the suspect in the Target security video are Black men with facial hair, a reasonable jury could find that the similarities end there.  Hoock's ex-husband's observation of a Black male "staring at him" in a Hyundai Sante Fe SUV also lacks any identifying characteristics

that would distinguish the suspect in the Target video from any other Black man with facial hair.  Moreover, beyond the alleged similarities between Clayborne and the suspect in the Target security video, Defendants do not point to any other evidence that would lead a reasonable jury to conclude that the detectives had reasonable suspicion to conduct an investigative stop on Clayborne.

Considering the totality of the circumstances (i.e., the lack of ongoing emergency and the unspecific alleged similarities between Clayborne and the suspect in the Target video), there is a genuine factual dispute whether the detectives had reasonable suspicion to conduct a Terry stop on Clayborne.  See Hicks, 531 F.3d at 558.

### 2. Defendants Are Not Entitled to Qualified Immunity on Clayborne's § 1983 Unreasonable Seizure Claim (Count I).

A defendant is entitled to qualified immunity in the Fourth Amendment context if a reasonable officer could have believed that "arguable" reasonable suspicion (for a traffic stop) or "arguable" probable cause (for an arrest) existed to detain the plaintiff.  See Huff v. Reichert, 744 F.3d 999, 1007 (7th Cir. 2014) (quoting Humphrey v. Staszak, 148 F.3d 719, 725 (7th Cir. 1998) (arguable reasonable suspicion and probable cause are established "when a

reasonable officer 'in the same circumstances and . . . possessing the same knowledge as the officer in question could have reasonably believed that [reasonable suspicion or] probable cause existed in light of well-established law.'"); Rouei v. Vill. of Skokie, 61 F. Supp. 3d 765, 778 (N.D. Ill. 2014) ("[Q]ualified immunity exists in a false arrest case where there is 'arguable' probable cause, ... and thus [qualified immunity] likely exists in a false Terry stop case where there is 'arguable' reasonable suspicion.").

In practice, this means that a government actor is entitled to qualified immunity unless the plaintiff shows that: (1) the facts, read in favor of the non-moving party, amount to a constitutional violation; and (2) the constitutional right was clearly established at the time of the alleged violation.  See Rainsberger v. Benner, 913 F.3d 640, 647 (7th Cir. 2019); Leiser v. Kloth, 933 F.3d 696, 701 (7th Cir. 2019), cert. denied, 140 S. Ct. 2722 (2020) (qualified immunity is an affirmative defense, but once a defendant properly raises the defense, the burden shifts to the plaintiff to defeat it). The Court need not always address both questions in the qualified immunity analysis.  Pearson v. Callahan, 555 U.S. 223, 236–42 (2009).  "[I]f the law was not clearly established, there is no need to

tackle the (often harder) question whether the challenged conduct
violated the Constitution." <u>Rainsberger</u>, 913 F.3d at 647.  But
where the law was clearly established, both qualified immunity
questions must be addressed.  <u>Id.</u>

Defendants argue that qualified immunity is appropriate here
because it "shields officers from liability for honest mistakes," and
cites to <u>Fleming v. Livingston Cty.</u> for the proposition that an officer
is entitled to qualified immunity when the arrestee substantially
matched the description given by the victim.  d/e 40, p. 15.  The
Court has previously found that a genuine issue of material fact
remains that allow for a reasonable jury to make two differing
conclusions, one supporting a finding of reasonable suspicion and
one supporting a finding of no reasonable suspicion.  If the
detectives did not have reasonable suspicion, then the officers
violated Clayborne's clearly established right to be free from
unreasonable seizures.  As a result, the Court cannot find that the
Defendants are entitled to qualified immunity.  <u>See</u> <u>Nettles-Bey v.</u>
<u>Williams</u>, 819 F.3d 959, 961 (7th Cir. 2016) (holding that where the
admissible evidence would permit two inferences, one of which
would implicate violations of a plaintiff's clearly established

constitutional rights, the case must proceed to trial, and the officers are not entitled to qualified immunity).  Therefore, Defendants' Motion for Summary Judgment as to Clayborne's unreasonable seizure claim (Count I) is DENIED.

**B. Defendants Are Not Entitled to Summary Judgment on Plaintiff Clayborne's False Arrest Claims (Counts II and III) Because There Is a Genuine Factual Dispute Whether the Detectives Had Probable Cause.**

Clayborne alleges that he was falsely arrested by Defendants under both § 1983 and Illinois law (Counts II and III).  The elements of a false arrest claim under § 1983 are essentially the same as those under Illinois law.  Thus, while the following analysis focuses on Clayborne's § 1983 claim, the analysis is equally applicable to Clayborne's Illinois claim for false arrest as well.

**1. Plaintiff Clayborne Has Raised a Genuine Issue of Material Fact That the Traffic Stop Resulted In an Arrest.**

In applying the two-step Fourth Amendment inquiry, the Court first examines whether a seizure occurred.  See Jimeno, 500 U.S. at 240.  Clayborne disputes that he went with the detectives to the police station voluntarily.  Voluntary cooperation would not be a seizure under the Fourth Amendment.  See United States v.

<u>Scheets</u>, 188 F.3d 829, 836 (7th Cir. 1999) (when an officer seeks a citizen's "voluntary cooperation through non-coercive questioning," no Fourth Amendment seizure has occurred).   The Court finds that a reasonable jury could find that Clayborne did not go with the detectives voluntarily and constituted a seizure.  <u>See Dunaway v. New York</u>, 442 U.S. 200, 212 (1979) (finding a seizure where the petitioner "was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room.").  Clayborne asserts that the Defendants took his wallet before he was placed into the rear of a market squad car.  d/e 45, p. 17, ¶ 4.  That the Defendants assert that Clayborne was "temporarily detained" rather than arrested does not matter.  d/e 40, p. 12; <u>see Dunaway</u>, 442 U.S. 200, 212-13 ("The mere facts that petitioner was not told he was under arrest, was not 'booked,' and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes . . . obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in <u>Terry</u> and its progeny.").  In fact, Defendants concede that "for the purposes of this motion . . .

Clayborne was not free to leave." d/e 40, p. 12; see Drayton, 536
U.S. at 201; Bostick, 501 U.S. at 439.

However, the Court must also consider whether the seizure
was an arrest or traffic stop to determine its reasonableness.  See
Jimeno, 500 U.S. at 240.  An investigative detention must "last no
longer than is necessary to effectuate the purpose of the stop" and
the investigative methods employed should be the "least intrusive
means reasonably available to verify or dispel the officer's suspicion
in a short period of time." Florida v. Royer, 460 U.S. 491, 500
(1983).  A stop lasting too long or unreasonably intrusive becomes
"a de facto arrest that must be based on probable cause." Bullock,
632 F.3d at 1015.  Although there is no "rigid time limit" for a stop,
relevant factors in deciding whether a Terry stop becomes an arrest
include "the officer's intent in stopping the individual, whether
there was a search, whether, or how much, questioning occurred,
whether there was a show of force[,] and whether the person
stopped could be said to have been taken into custody." United
States v. Eymann, 962 F.3d 273, 284 (7th Cir. 2020) (citing United
States v. Rodriguez, 831 F.2d 162, 166 (7th Cir. 1987)); see also
Bullock, 632 F.3d at 1015 (citing United States v. Sharpe, 470 U.S.

675, 686 (1985) (when assessing the reasonableness of the length of

stop, the court should consider "the law enforcement purposes to

be served by the stop, the time reasonably needed to effectuate

those purposes, and whether the police diligently pursued their

investigation.").  Because no two police encounters are identical,

there is "no litmus-paper test for determining when a seizure

exceeds the bounds of an investigative stop and becomes an arrest."

Bullock, 632 F.3d at 1016.

Clayborne alleges that the detectives' traffic stop and

subsequent transportation to the police station constituted a false

arrest in violation of the Fourth Amendment because the stop and

transport were conducted without an arrest warrant, probable

cause, or any other justification.  See Amended Complaint, d/e 22,

p. 22.  Clayborne argues that the detectives could have confirmed

Clayborne's whereabouts at the time of the theft in a manner of

minutes at the time of the traffic stop.  Clayborne argues that even

"if the Defendants possessed an articulable suspicion that

Clayborne committed the theft and fraudulent use of the credit

cards," the investigatory stop exceeded the limits of an investigatory

Terry stop when the detectives "demand[ed]" Clayborne go with

them to the police station; placed him in a guarded interview room; retained his automobile keys, wallet, and telephone; and left him in that room for nearly two hours "without indicating in any meaningful way that he was free to leave." d/e 45, p. 24.

The Court finds that there is genuine dispute of material fact whether Clayborne's detention exceeded the limits of an investigative traffic stop. Several factors find in favor of finding that Clayborne was not arrested. The purpose of Clayborne's two-hour detention was to investigate him as a suspect in the wallet theft. While Clayborne was held at the police station, the detectives further investigated the theft, first going to the Prairie Heart Institute to bring Erley to the station and then to Robert's Seafood to determine whether Clayborne had been working on the day and time of the wallet theft and the use of the credit cards. The Court acknowledges that the detectives here spent the two hours "diligently pursu[ing]" their investigation to confirm or deny Clayborne's alibi. Sharpe, 470 U.S. at 686. There is no evidence that the detectives failed to continue their investigation into Clayborne as a suspect after his seizure. Moreover, the Court acknowledges the detectives' belief that it was necessary to detain

Clayborne, because, in part, if he were in fact guilty, he would have been alerted to the investigation and flee while further investigation was taking place.  d/e 46, p. 5.  Moreover, the detectives did not handcuff Clayborne and did not "officially" place him under arrest, factors that cut against a finding that Clayborne was arrested.  d/e 40, p. 12.

Nevertheless, a reasonable jury could also find that the manner of Clayborne's detention—transported to the police station, held in an unlocked interview room, read <u>Miranda</u> warnings, and deprived of his automobile keys, wallet, and phone—was unreasonable and more intrusive than necessary.  See <u>Kaupp v. Texas</u>, 538 U.S. 626, 630 (2003) ("involuntary transport to a police station for questioning is 'sufficiently like arres[t] to invoke the traditional rule that arrest may constitutionally be made only on probable cause'"); <u>see also</u> <u>Dunaway v. New York</u>, 442 U.S. 200, 212–13 (1979) (finding "detention of petitioner was in important respects indistinguishable from a traditional arrest" where "he was ... transported to a police station, and placed in an interrogation room").  Additionally, at the time of the initial traffic stop, the detectives did not inquire about his alleged involvement in the

wallet theft.  See Royer, 460 U.S. at 500 (the investigative methods employed should be the "least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."). A reasonable jury could find that the detectives could have accomplished their purpose for initially stopping Clayborne by asking him questions at the time of the traffic stop about his whereabouts at the date and time of the wallet theft.  Even if Clayborne were detained at the station for two hours and for investigative purposes, "such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause."  Hayes v. Florida, 470 U.S. 811, 815 (1985). Therefore, although the detectives maintain that Clayborne was not officially placed under arrest, a reasonable jury could find that the combination of transporting him to the police station, depriving him of his automobile keys, wallet, and phone, and reading him his Miranda warnings moves the encounter from a Terry stop to a de facto arrest.  A reasonable jury could find that "it was [not] necessary to detain" Clayborne further.  Sharpe, 470 U.S. at 676.

**2. Plaintiff Clayborne Has Raised a Genuine Issue of Material Fact That the Detectives Lacked Probable Cause to Arrest Him.**

However, to state a claim for false arrest under § 1983, a plaintiff must allege that there was no probable cause for his arrest. Gardunio v. Town of Cicero, 674 F. Supp. 2d 976, 984 (N.D. Ill. 2009) (citing Gonzalez v. City of Elgin, 578 F.3d 526, 537 (7th Cir. 2009)). The existence of probable cause is an "an absolute defense to any § 1983 claim for false arrest." Abbott v. Sangamon County, 705 F.3d 706, 713–14 (7th Cir. 2013). The Court finds that there is a genuine material issue of fact whether the detectives had probable cause to arrest Clayborne.

A police officer has probable cause to make an arrest if a reasonable person, knowing all of the facts and circumstances known to this officer, would believe that the individual in question has committed or is committing a crime. Seiser v. City of Chicago, 762 F.3d 647, 654 (7th Cir. 2014). Whether an arrest is supported by probable cause is usually a question of fact decided by the jury. Abbott, 705 F.3d at 714. However, if the underlying facts are undisputed, the court can make that decision on summary judgment. Id.

Defendants argue for summary judgment on Clayborne's false arrest claims, asserting that the detectives would have had probable cause to arrest Clayborne because Hoock, Officer Wallace, and the detectives identified Clayborne as the suspect in the photographs. In response, Clayborne argues that the detectives had no probable cause because they failed to pursue other reasonable avenues of investigation cause to arrest him. Specifically, Clayborne argues that Defendants knew where Clayborne had worked prior to stopping him, and the detectives could have confirmed with Clayborne's employer prior to stopping Clayborne whether he was working at the time of the theft and use of the stolen card. d/e 45, p. 30. Clayborne also argues that there was no identification that Clayborne was the suspect in the Target photo, but at most an observation that he "resembled" the suspect. d/e 45, p. 26. He also points to the existence of other photos and video footage that do not resemble him or walk in a similar manner as him, and that the detectives failed to note similarities between Clayborne and the suspect in the Target video with any particularity. Clayborne also argues that, at the time the detectives stopped Clayborne's vehicle,

the detectives testified that they had not established probable cause for an arrest.

First, the Court notes that whether the detectives had probable cause is an objective inquiry; their subjective beliefs are irrelevant, whatever those beliefs may be.  See Abbott, 705 F.3d at 714 (whether probable cause exists is an objective inquiry, and the officer's subjective state of mind is irrelevant).  As a result, even if an officer believed that probable cause were lacking, the Court still has the duty to objectively determine if probable cause was present.

In Sornberger v. City of Knoxville, the Seventh Circuit found that officers lacked probable cause to arrest plaintiff Sornberger for bank robbery.  434 F.3d 1006, 1014 (7th Cir. 2006).  There, the court noted that Sornberger did not match the physical description of the robber provided by the sole eyewitness who viewed the robber's face.  Id.  The court also considered that a bank employee, who knew Sornberger, informed the police that "at certain angles of the surveillance footage," the suspect did not resemble Sornberger. Id.  Furthermore, the low resolution of the camera footage made it difficult to discern any significant details.  Id.

Similarly, in <u>Maxwell v. City of Indianapolis</u>, plaintiff Maxwell brought a § 1983 false arrest claim after being incorrectly identified as a fugitive described on a television program.  998 F.2d 431 (7th Cir. 1993).  There, the television bulletin described the fugitive as "a male Caucasian born on September 25, 1933 who is 5'11, weighs 175 pounds, and has grey hair, green eyes, a fair complexion, a grey moustache, and a goatee."  <u>Id.</u> at 432–33.  The fugitive was also missing the tip of his left index finger.  <u>Id.</u>  Maxwell largely fit the description of the fugitive, except that Maxwell was much larger (6'5" and 270 pounds) and was missing the tip of his left middle finger.  <u>Id.</u> at 433.  Despite the differences, the officers arrested him.  <u>Id.</u>  The Seventh Circuit found that "[a] review of the description of [the fugitive] in comparison to the appearance of Maxwell does raise a substantial question as to whether a prudent police officer would have probable cause to believe Maxwell was [the fugitive]."  <u>Id.</u> at 434.  Specifically, the difference in size between Maxwell and the fugitive "should have given the police officers pause."  <u>Id.</u> at 435.

Here, the Court finds Sornberger and <u>Maxwell</u> instructive. Defendants make vague assertions that Clayborne resembled the

suspect in the Target video, but Defendants do not cite specific physical characteristics or other distinguishing features, besides both being Black men with facial hair.  Additionally, the photo from the Target security video that law enforcement shared with Hoock is low-resolution and taken from a downward angle.  These photographs are not the type of quality from which an observer could clearly discern specific facial characteristics.  Moreover, Clayborne alleges that the Target video displays the suspect walking bow-legged and with a distinctive gait, unlike Clayborne.  The low clarity of resolution of the video footage, in addition to Clayborne's assertion that he lacks the suspect's bow legs and distinctive gait, undermine probable cause.

The Court notes that the Seventh Circuit has found probable cause when an arrest is based, in part, on alleged similarities between the suspect and the individual arrested.  <u>See</u> <u>United States v. Carpenter</u>, 342 F.3d 812, 814–15 (7th Cir. 2003) (probable cause to arrest defendant whose distinctive outfit was identical to bank robber's, who exactly fit the police report's description of the lookout's age, race, and height, and who was seen with two men who fit the general description of the other two robbers hours after

the robbery); <u>Pasiewicz v. Lake Cty. Forest Pres. Dist.</u>, 270 F.3d
520, 522, 524–25 (7th Cir. 2001) (probable cause to arrest suspect
who bore "fair resemblance" but "did not match exactly" witnesses'
descriptions as to age, height, weight, and hairstyle).  However,
<u>Carpenter</u> and <u>Pasiewicz</u> are distinguishable because here,
Defendants make only general observations of a resemblance
between Clayborne and the suspect, with no specific references to
facial features, articles of clothing, or other distinctive
characteristics.

     Additionally, Defendants cite <u>Hart v. Mannina</u> for the
proposition that probable cause can be based on a single
identification from a credible witness.  798 F.3d 578, 587 (7th Cir.
2015).  However, unlike the eye-witness in <u>Hart</u>, Hoock did not
personally witness the wallet theft but subsequently noted a
resemblance in the video between the suspect and Clayborne.  This
situation is factually distinguishable from <u>Woods v. Chicago</u> where
law enforcement officers have "no constitutional obligation to
conduct any further investigation before making an arrest if they
have received information from a reasonably credible victim or
eyewitness sufficient to supply probable cause."  234 F.3d 979, 997

(7th Cir. 2000) (citing <u>Gramenos v. Jewel Companies, Inc.</u>, 797 F.2d 432, 440 (7th Cir. 1986)).  In fact, in <u>Bailey v. City of Chicago</u>, the Seventh Circuit noted that there was no corresponding rule for identifications by persons not eyewitnesses to an event but who viewed video footage afterward.  779 F.3d 689, 694 (7th Cir. 2015). Instead of establishing such a rule, the court reasoned that the pivotal question is whether the statements of the persons were sufficiently credible for the officers to have good reason to rely on them.  <u>Id.</u>

Clearly, the identifications made in <u>Bailey</u> are distinguishable from the identifications of Hoock and Officer Wallace here.  In <u>Bailey</u>, six individuals who were familiar with Bailey conclusively identified him as the assailant in the video.  Officer Wallace's report indicated that when presented with a photograph of the suspect in the Target security video, Hoock indicated that she did not recognize him as an employee or a patient.  d/e 40, Ex. 5, p. 4. Hoock indicated that she "didn't think that [Erley] would have stolen her wallet, or that she had been [at work] today, but wanted to note that the suspect reminded her of [Erley's] boyfriend. Otherwise, she has no idea who he may be."  <u>Id.</u>

Moreover, Officer Wallace wrote in her report that a photo of Clayborne from Erley's Facebook page "resemble[d] the suspect" but that she "could not positively identify him from [the] photo[]s."  Ex. E, p. 4.  Hoock and Officer Wallace's identification of Clayborne, based on low resolution security videos, were tentative at best, and Unlike the identifications made in Bailey by six people who knew the defendant, here, Defendant detectives have not pointed to evidence demonstrating that either Hoock or Officer Wallace personally knew Clayborne.  But see McDaniel v. Polley, 847 F.3d 887, 895 n.5 (7th Cir. 2017) (explaining that officer's "tentative" identification from photo array line-up—stating that the defendant "look[ed] like" the murder suspect—was enough for probable cause to arrest defendant because it was credible).

The presence or absence of probable cause turns on the resemblance of Clayborne to the suspect in the low resolution Target security video.  "[I]t is incumbent upon law enforcement officials to make a thorough investigation and exercise reasonable judgment before invoking the awesome power of arrest and detention."  Moore v. The Marketplace Restaurant, 754 F.2d 1336, 1345–46 (7th Cir. 1985).  Under the circumstances, there is a

genuine dispute of material fact regarding whether the detectives
had probable cause to arrest Clayborne. Taken as a whole, a
reasonable jury could find that the detectives did not have probable
cause to arrest Clayborne. Therefore, Defendants' Motion for
Summary Judgment of Clayborne's Illinois false arrest claim (Count
III) is also DENIED.

### 3. Defendants Are Not Entitled to Qualified Immunity on Clayborne's § 1983 false arrest claim (Count II).

Defendants are entitled to qualified immunity with respect to
Clayborne's § 1983 false arrest claim if a reasonable officer could
have believed that "arguable" probable cause existed to arrest
Clayborne. See Huff, 744 F.3d at 1007. For similar reasons that
Defendants are not entitled to qualified immunity on Clayborne's §
1983 unreasonable seizure claim, Defendants are not entitled to
qualified immunity with respect to his § 1983 false arrest claim. A
genuine issue of material fact exists regarding whether the
detectives had probable cause to arrest Clayborne. See Nettles-Bey,
819 F.3d at 959. Therefore, Defendants' Motion for Summary
Judgment of Clayborne's § 1983 false arrest claim (Count II) is
DENIED.

## C. Defendants Are Not Entitled to Summary Judgment on Erley's § 1983 Unreasonable Seizure Claim (Count VI).

Defendants move for summary judgment on the grounds that they had reasonable suspicion to question Erley and that as a matter of law, she was never seized.  Furthermore, they argue that they are entitled to qualified immunity as to Erley's § 1983 claims.

### 1. There Is a Genuine Issue of Material Fact Whether the Detectives Seized Erley.

Erley first alleges that the detectives unreasonably seized her when they appeared at her place of employment, "demanded" that she accompany them to the police station, and took her to the police station where they questioned her.  Applying the two-step Fourth Amendment inquiry, the Court first examines whether Erley was seized at her workplace.  See Jimeno, 500 U.S. at 240.  In considering whether there was a seizure, the court considers "all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."  Bostick, 501 U.S. at 439.

Several factors support finding that Erley was not seized. Erley was not placed under arrest, was not placed in handcuffs,

shared the front seat of the police car with Detective Maddox, and was never told she was a suspect.  Moreover, although Erley argues that the detectives planned to "detain" Erley, to the extent that the detectives understood that to mean that someone was not free to leave, and that Erley felt like she had no option but to go with the detectives to the police station, that is not dispositive here.  See Carlson v. Bukovic, 621 F.3d 610, 619 n.15 (7th Cir. 2010 ("The reasonable person-free to leave standard is an objective one, and both the officer's and the encountered individual's subjective beliefs during the encounter are not determinative as to whether a seizure occurred.").  Rather, the Court focuses on whether an objective person in the same situation as Erley's would feel as if she was detained.

Nevertheless, the Court finds that Erley has provided sufficient evidence that a reasonable jury could find that she was seized, and that her interaction with the detectives was not voluntary.  See Scheets, 188 F.3d at 836 (when an officer seeks a citizen's "voluntary cooperation through non-coercive questioning," no Fourth Amendment seizure has occurred).  The detectives told Erley that she "need[ed] to come talk with [them]," and they transported

her to the police station.  The detectives instructed her to remove her lab coat, stethoscope, and work phone, and took possession of her personal cell phone.  Erley asserts that the detectives made it very clear to her that she needed to take her work gear off and come with them.  Upon arrival at the police station, Erley alleges that one of the detectives instructed her to be quiet and walk with her hands behind her back.  A reasonable jury may find that the detectives' use of forceful language, possession of her personal cell phone, and transportation of Erley to the police station demonstrated a show of authority by the detectives such that a reasonable person would not have felt free to leave.  See Mendenhall, 466 U.S. at 552; Dunaway, 442 U.S. at 212; Barker, 467 F.3d at 629.

## 2. There Is a Genuine Issue of Material Fact Whether Erley's Seizure Was Unreasonable.

Next, the Court examines whether Erley's alleged seizure was reasonable.  See Jimeno, 500 U.S. at 240.  Reasonable suspicion requires that an officer is able to point to "specific and articulable facts" that suggest criminality, and is based upon the totality of the circumstances known to the officer at the time the stop is made.  Terry, 392 U.S. at 21–22; Hicks, 531 F.3d at 558.

The detectives argue that they had a reasonable basis to ask Erley questions because she was the nexus between Clayborne and Hoock.  Erley argues that her prolonged detention at the police station was an unreasonable seizure because the detectives did not have reasonable suspicion that she was involved in criminal activity.  Defendants dispute that Erley's questioning was unreasonably prolonged.  Rather, Defendants argue, Erley was kept at the station only long enough to clear Clayborne and her potential involvement in the wallet theft.

Although the detectives testified that Erley was not a suspect in the wallet investigation, "[t]he officer's subjective motivations for stopping and detaining a suspect are not relevant to the reasonableness inquiry . . . [t]he reasonableness of the stop is based on an objective standard[.]"  Bullock, 632 F.3d at 1012.  The only evidence that Defendants point to in support of their decision to question Erley is that she was the nexus between Clayborne and Hoock and that her vehicle may have been involved because Hoock's ex-husband had observed a suspicious drive-by of his rural evidence by a Black male in a vehicle matching Erley's vehicle.  The detectives were aware that Erley was not at work the day of the

wallet theft, and Defendants do not point to evidence suggesting that the suspect in the Target video had a female accomplice.

Under these circumstances, there is a genuine dispute of material fact whether the detectives had reasonable suspicion to seize Erley. Therefore, Defendants' summary judgment of Erley's unreasonable seizure claim (Count VI) is DENIED.

### 3. Defendants Are Not Entitled to Qualified Immunity.

Defendants argue that even if Erley were seized without reasonable cause, Defendants are entitled to qualified immunity because, at most, the detectives were guilty of an honest mistake with respect to the questioning of Erley. They argue that the detectives were unaware of any clear precedent making it impermissible to question Erley when her boyfriend was a potential suspect in a theft.

Defendants are entitled to qualified immunity with respect to Erley's § 1983 unreasonable seizure claim only if a reasonable officer could have believed that "arguable" reasonable suspicion existed to seize Erley. See Huff, 744 F.3d at 1007. As discussed above, a genuine issue of material fact exists regarding whether the detectives had reasonable suspicion to seize Erley. See Nettles-Bey,

819 F.3d at 959.  Therefore, Defendants' Motion for Summary
Judgment of Erley's § 1983 unreasonable seizure claim (Count VI)
is DENIED.

### D. Defendants Are Not Entitled to Summary Judgment on Erley's False Arrest Claims (Counts VII and VIII).

Erley alleges that she was falsely arrested by Defendants
under both § 1983 and Illinois law (Counts VII and VIII).  As stated
with regards to Clayborne's false arrest claims, while the following
analysis focuses on Erley's § 1983 claim, it is also applicable to
Erley's Illinois claim for false arrest.

Defendants do not argue that Erley was not falsely arrested or
that they had probable cause to arrest Erley.  Rather, they argue
that they had a reasonable basis to ask her questions and that, as a
matter of law, the questioning did not rise to a seizure.  As a result,
any argument that Erley was not falsely arrested under Illinois law
is forfeited for summary judgment purposes.  See Sublett v. John
Wiley & Sons, Inc., 463 F.3d 731, 736 (7th Cir. 2006) ("As a general
matter, if the moving party does not raise an issue in support of its
motion for summary judgment, the nonmoving party is not required
to present evidence on that point, and the district court should not

rely on that ground in its decision."). Similarly, Defendants only assert qualified immunity with respect to having a reasonable basis to seize Erley, not probable cause. Therefore, Defendants' Motion for Summary Judgment as to Erley's claims for false arrest (Counts VII and VIII) is DENIED.

**E. Defendants Are Not Entitled to Summary Judgment on Plaintiff's IIED Claims (Counts IV and IX).**

To survive summary judgment on intentional infliction of emotional distress (IIED) claims under Illinois law, plaintiffs must present evidence showing that "(1) the defendant's conduct was truly extreme and outrageous, (2) the defendant either intended to inflict emotional distress or knew there was at least a high probability that he would cause severe emotional distress, and (3) the conduct in fact caused severe emotional distress." Stokes v. Bd. of Educ., 599 F.3d 617, 626 (7th Cir. 2010) (citations omitted).

First, when the facts are taken in the light reasonably most favorable to Plaintiffs, a reasonable jury may find that the detectives' actions were extreme and outrageous. To satisfy the "truly extreme and outrageous" element, a defendant's conduct must be "so extreme as to go beyond all possible bounds of decency

and be regarded as intolerable in a civilized community." Id.
(quoting Feltmeier v. Feltmeier, 798 N.E.2d 75, 83 (Ill. 2003)).  Non-
exclusive factors that the court may consider include: the degree of
power or authority a defendant has over a plaintiff, whether the
defendant reasonably believed that his objective was legitimate, and
whether the plaintiff is particularly susceptible to emotional distress
because of some physical or mental condition or peculiarity.
Honaker v. Smith, 256 F.3d 477, 491–93 (7th Cir. 2001) (citing
Illinois cases).  IIED does not extend to "mere insults, indignities,
threats, annoyances, petty oppressions, or other trivialities."
Breneisen v. Motorola, Inc., 512 F.3d 972, 983 (7th Cir. 2008).

Plaintiffs argue that the detectives' conduct was extreme and
outrageous because they failed to adequately investigate the wallet
theft prior to detaining Clayborne, they knew Erley was not at work
the day of the theft, and they had no information that the suspect
had an accomplice.  Plaintiffs argue that the detectives' "plan to
detain [them were] not the product of reasoned planning combined
with the use of lawful investigative techniques."  d/e 44, p. 61; d/e
45, p. 37.  Plaintiffs contend that the detectives planned to get a

quick confession from Clayborne or incriminating statements from Erley to appease Hoock.

Here, a reasonable jury may find that Defendants exercised a degree of authority over both Clayborne and Erley by detaining them.  See McGrath v. Fahey, 126 Ill. 2d 78, 86–87 (1988) (the "more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment.").  Moreover, a reasonable jury may find that the detectives did not reasonably believe that their objectives were legitimate.   The detectives pursued Clayborne as the suspect and questioned Erley because of Hoock's identification, Officer Wallace's report, and the detectives' own personal observations of similarities between Clayborne and the video suspect.  As discussed above, a reasonable jury may find that the detectives lacked reasonable suspicion and/or probable cause to seize Erley and Clayborne.  As a result, a reasonable jury may find that the detectives' conduct was "beyond all bounds of decency" as required for outrageous and extreme conduct under Illinois law.  Feltmeier, 798 N.E.2d at 83.

Second, a reasonable jury may find that the detectives intended to inflict severe emotional distress or that there was a high probability of inflicting such distress. The second element is satisfied when the defendant's actions "by their very nature[] were likely to cause severe distress or when the defendant knew that a plaintiff was particularly susceptible to such distress." Honaker, 256 F.3d at 494.

Plaintiffs argue that the detectives' plan to detain and interrogate both Plaintiffs to solicit a confession or incriminating statements is indicative of their intent to inflict severe emotional distress. A reasonable jury may find that the detectives' actions when questioning Erley—going to her workplace, having her accompany them to the station in front of her colleagues, and refusing to answer her questions—were likely to cause severe distress. Additionally, although Defendants point to Detective Brown's voluntary reimbursement from his own funds of Clayborne for income lost due to missing work, a reasonable jury may find that the detectives' actions while detaining Clayborne—leaving him at the police station for nearly two hours, and confiscating his cell phone, wallet, and keys—were likely to cause severe emotional

distress.  As a result, a reasonable jury may find that the detectives intended to inflict severe emotional distress or that there was a high probability of inflicting such distress.

Lastly, a reasonable jury may find that Defendants' conduct in fact caused severe emotional distress.  To satisfy the third element, "the [emotional] distress must be so severe that no reasonable man could be expected to endure it."  Welsh v. Commonwealth Edison Co., 713 N.E.2d 679, 684 (Ill. App. 1999) (quoting Public Finance Corp. v. Davis, 360 N.E.2d 765, 767 (1976)).  "Garden-variety emotional distress is insufficient to meet that standard."  McGreal v. Village of Orland Park, 850 F.3d 308, 314 (7th Cir. 2017).

Here, Clayborne asserts that because of the detectives' conduct, he gets nervous and that his "anxiety is through the roof." d/e 45, p. 39.  Erley testifies that because of this incident, she is afraid of the police, that she will be accused of something she has not done, and that she pulls off the road when a police officer gets behind her.  A reasonable jury may find that Clayborne's and Erley's emotional distress is so severe that "no reasonable man could be expected to endure it."  Welsh, 713 N.E.2d at 684.

Therefore, Defendants' Motion for Summary Judgment as to Plaintiffs' IIED claims (Counts IV and IX) is DENIED.

### F. Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Indemnification Claims (Counts V and X).

Clayborne and Erley seek indemnification against the City for any compensatory damages awarded against the detectives (Counts V and X). Plaintiffs' indemnification claims against the City are contingent on their individual claims against the detectives. <u>See</u> Illinois Tort Immunity Act, 745 ILCS 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable."). The Court has previously found that there exists genuine dispute of material fact as to Counts I, II, III, IV, VI, VII, VIII, and IX in the Amended Complaint. Therefore, Defendant's Motion for Summary Judgment as to Plaintiffs' indemnification claims (Counts V and X) is DENIED.

## VI.   CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (d/e 40) is DENIED. All ten counts of Plaintiffs' Amended Complaint remain pending against Defendants. The Court SETS a status conference for April 17, 2023, at 11:00

a.m. via videoconference to discuss scheduling for final pretrial and

trial.

**IT IS SO ORDERED.**
**ENTERED: March 20, 2023.**
**FOR THE COURT.**

*/s/ Sue E. Myerscough*
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**